May it please the Court, Phil Lax for the North Dakota Secretary of State. So this appeal of course relates to the one you just heard, but it raises two different questions that go to the merits of the underlying appeal. So first, given this Court's holding in Arkansas last year that the VRA does not contain an implied private right of action for vote dilution claims, can private claims nonetheless be brought using 1983? And second, if they can, did the District Court make the findings that will be necessary in this case to invalidate part of the state's election map? And we would urge the answer to both questions is no. And I'll begin with the private right of action. And I'll start with the test for a 1983 claim since on appeal plaintiffs dispute the applicable test. For resolving if claims can be brought using 1983, the Supreme Court uses the Tupac-Gonzaga test. And plaintiffs argue this Court should not apply the Gonzaga test here, but instead create a whole new test that would presume any claims brought under the VRA are privately enforceable using 1983 unless the statute says otherwise. So the Gonzaga test, there's no case finding it applies to the VRA, correct, in determining rights under the VRA? Not from the Supreme Court, Your Honor, but several circuits have addressed other provisions of the VRA, and all of them have applied the Gonzaga test. Well, I mean, I was just reading Justice Barrett's concurrence in the more — what's the name of the case? I'm sure you have it on the top of your head. But, you know, in most of these cases are spending clause cases. And there's been a variety of justices taking different views on the propriety of, you know, creating rights in spending act cases. And Justice Barrett's concurrence, though, says, look, we apply Gonzaga when we're addressing a spending clause case. And I'm wondering what that means. Because certainly the context for these debates and discussions amongst the different justices has been spending clause. And Justice Barrett, if you read that, suggests possibly that it's limited to those cases, and that the VRA as a, you know, arguably a law coming out of the post, you know, the Civil War amendments is different. Would you just try to address that a minute? And maybe it's just a concurring opinion, and I'm not sure what it means either. Yes, Your Honor. So Justice Barrett's concurrence does reference Gonzaga as applicable to statutes enacted pursuant to Congress' spending clause power. But she never says it's limited to that. And, in fact, the Supreme Court has applied it to non-spending power statutes, the Commerce Clause power, for example. That was a city of Rancho Palos Verdes. So the Supreme Court has applied Gonzaga outside of the spending context. Specifically in response to your question, we're not aware that the Supreme Court has applied it to a case under the VRA or under similar Reconstruction Amendment authorities. But it's never suggested a different test would apply for different statutes. At least it's never expressly said that, not in a majority opinion, not in a dissent, not in a footnote that we're aware of. And, like I said, several of the circuits have applied Gonzaga. Two other provisions of the VRA, the district court here applied Gonzaga. So we think on a general level, that weighs against creating a new test. But I would also say more fundamentally, the test that plaintiffs are asking for would go back to an ancient regime where private rights were inferred from congressional silence, which the Supreme Court expressly rejected nearly 50 years ago and has never gone back to. And I'd actually, I'd like to talk about the background context for when vote dilution claims were enacted, because the other side suggests that background context supports a presumption that when vote dilution claims were enacted, that Congress would have intended to create a private right of action through silence. Perhaps unsurprisingly, we see the history a bit differently. For vote dilution claims, the relevant time period isn't 1965 when the VRA was enacted and when the Supreme Court was in its heyday of inferring implied rights of action. Instead, the relevant time is 1982 when it created vote dilution claims. And between 1965 and 1982, two very significant things had occurred. First, the Supreme Court turned the corner on inferring implied rights of action out of silence. That started with Court v. Ashe in 1975. And then there were several decisions after that which hammered the point home, and the Supreme Court said what we said in Court v. Ashe we meant. And then, of course, there was the Bolden decision in 1980, which prompted Congress to amend the VRA to create vote dilution claims. And in Bolden, the Supreme Court noted it was not clear whether Section 2, as drafted, created a private right. It said it was assuming one for present purposes. And that, and then at the end of that sentence, it had a footnote with a but-see citation to two of those cases which said implied rights of action will not be found in congressional silence. So when Congress came around in 1982 and amended the VRA in response to Bolden, we think it's fair to say Congress was on notice that congressional silence would not be read to infer a private right of action. So all that's to say we don't think the historical context supports dropping Gonzaga and creating a presumption of enforceability. So turning then to the Gonzaga test, Gonzaga creates a two-part test. The first part of the test asks whether the statute unambiguously creates an individual right. And on this part of the inquiry, the 1983 inquiry mirrors the implied right inquiry. It's the exact same inquiry. If I can quote the Supreme Court, it said if Congress wishes to create new rights enforceable under 1983, it must do so in clear and unambiguous terms, no less and no more than what is required under an implied private right of action. And so the first part of . . . But what were you quoting there? Oh, that was Gonzaga at 290, Your Honor. But what is the new right here that we're talking about? Right to vote, isn't it? It is a vote dilution claim, Your Honor. That's what we're referring to. And . . . Well, that distinction makes a difference, doesn't it, if it's a right to vote or a right to make a vote dilution claim? Yes, and we understand vote dilution claims as being something new, something a little different than just a right to vote. That's why . . . A right to vote without your vote being diluted? Is that the right? No, I'm serious. How do you define the right that's being claimed here? I think part of distinguishing vote dilution claims from other things that are typically thought of as individual rights might be helped by comparing it to a racial gerrymandering claim, because . . . Could you just first say what you think the right is? Well, we would say it's a claim. We would say at the highest level, it's a prohibition against political processes being created that have a dilutive effect on people's votes on account of the race. And the focus in the . . . I'm sorry, Chief. The focus in your mind is on the government action, the prohibition on government action, as I take it. We think that's the best way to read Section 2 in its entirety. And we would note the Arkansas decision noted that it was at least unclear whether Section 2 . . . If it's dicta, I would think it's strong. Do you think it's dicta or do you not think it's dicta? I think it was part of the Court's analytical process before it reached a conclusion. So the question is, is it persuasive or is it controlling? I would say it was not the holding of the Court, so it's not controlling. But I would say the level of treatment given by the Court when addressing that question suggests it was at least persuasive. It wasn't an assumption that the Court just moved right on by. Why isn't it a holding, then, if it was necessary to the rationale of the case? In theory, Your Honor, the Arkansas Court could have just skipped the private rights action entirely and just went straight to remedy. I see. But it didn't. It addressed private rights. So you're saying it may be dicta because . . . In theory . . . . . . that part could have been skipped over altogether. In theory, it could have been skipped entirely. I will concede that, Your Honor. But the Arkansas panel didn't skip it entirely. They addressed it with nearly a page before reaching a conclusion that it was just simply unclear whether it was focused on a prohibition or a right. And under Gonzaga, the test is clarity. So if it's not clear, that means a private right is not created. But I'd like to go back, Your Honor, and compare vote dilution claims against racial gerrymandering claims, because I think that goes to the nature of the right and whether what we're referring to with vote dilution claims is individual or collective in nature. So when the VRA was amended to create vote dilution claims, Justice Scalia referred to it as a radical transformation. That's what he said in his Chisholm dissent. And I think he said that for good reason. It's different from racial gerrymandering claims and from most other disparate impact claims, because when you're trying to prove racial gerrymandering, the ultimate inquiry here is still intent. And you're using disparate impact to establish unlawful intent. Did the government unlawfully consider my race when drawing this map? And the Supreme Court is improperly classifying people based on their race. That is an individual harm. It's an injury to their individual right not to be improperly classified by race. But what makes vote dilution claims different is you're not using disparate impact as circumstantial evidence of improper consideration of race. The disparate impact is not the evidence of the violation. It is the violation. That's why in this court, or in this case, the district court could find the State in violation, but also find the State thought it was trying to — the State thought it was complying with the VRA. Well, I follow the argument, but doesn't Shaw say otherwise fairly specifically? Well, Your Honor, thank you for bringing up Shaw. We would say on that point that the Supreme Court binds with its holdings, not with its language. And Shaw wasn't a private right of action case. It wasn't addressing the nature of the right in that context. What Shaw, too, actually held, the question presented there at the tail end of the opinion was whether a racial gerrymandering violation in one part of the State could be excused if the State created an additional majority-minority district in an entirely different part of the State. And the Supreme Court said, no, there's not racial interchangeability across the entire State. But that was the question that was presented, and that was the holding of the case. It didn't address the case in the nature of a private right action. And I would also note two specific points on Shaw, too. When referring to vote dilution claims, it referred to them being proven for a particular area. That was the phrase they used. And Shaw, too, was also the case where the Supreme Court had a footnote, I believe it was footnote 9, which said individual plaintiffs, even if they prevail in a vote dilution claim, are not entitled to a remedy that benefits them personally. And I think that's another important point when you're considering the nature of a vote dilution claim. If a private — if an individual plaintiff prevails and the State is required to enact an additional majority-minority district, the prevailing plaintiff is not entitled to be in that district. They can remain in a district where, due to racial block voting, the majority of their ethnicity is still unable to elect the candidates of their choice. So the remedy they are able to receive is not a remedy that benefits them personally, at least not necessarily. I think that makes vote dilution claims somewhat different than most everything else you would conceive of as an individual right. So I'd like to also spend a few minutes now saying, presuming if the Court disagrees on that point and finds that — Let me just go down one road. If I recall right, the Arkansas opinion didn't cite the Supreme Court Talevsky case. And you're sort of saying that the focus of Section 2 is on state and political subdivisions and groups. But Talevsky sort of says it would be strange to hold that a statutory provision fails to secure rights simply because it considers, alongside the right bearers, the actors that might threaten those rights. Does that cut against your argument? I don't think it cuts against us, Your Honor. We read Talevsky as saying there's not a per se rule either way. As the Supreme Court said in Gonzaga, that simple use of the word right doesn't mean that a statute is right-focused. Instead, the Court has to look at the focus of the section. And Talevsky said, simply mentioning the entities that are prohibited from engaging in conduct doesn't create a per se rule that is prohibition-focused. The inquiry is still the focus of the section. And we would say Section 2, when it's read in its entirety, it's at least unclear, as the Arkansas Court noted, whether it's prohibition-focused or right-focused. So with the Court's leave, I'd also like to spend a few minutes discussing why the district court erred when it invalidated part of North Dakota's election map. And to set the background, the Jingles Factors are supposed to set exacting requirements that limit judicial intervention to only striking down maps that are the product of intensive racial politics. Because once you get past them, once you get past the Jingles Factors, the totality of circumstances analysis turns into a non-exclusive, seven-factor balancing test where I think it's fair to say it's become notoriously hard for states to predict whether they will be held in compliance or not. So that's why the Jingles Factors are supposed to set exacting requirements. That's why the Supreme Court has said those factors cannot be assumed, they must be proven. And we would submit that the district court failed to meet those exacting requirements here. And the most concerning example was the district court's assumption during Jingles 1 that plaintiffs can predominantly consider race when offering illustrative maps. Now, Jingles 1 requires the plaintiff to put forward maps. Did the district court actually predominantly — I think I've read that Section 2, but is that what actually happened here? Didn't the district court reference another list of factors including — off the top of my head, but I think cultural cohesion or something along those lines, economic and other issues in reaching its ultimate decision? Well, Your Honor, the district court did list shared cultural values and things along that line that could suggest there could be a basis for making that finding. But when you actually get down to it, the district court did not make a finding of racial predominance. Instead, it dropped a footnote saying even assuming racial predominance, that would be okay if the plaintiffs thought it was essential to comply with the VRA. So the district court never made the finding that could be reviewed by this Court. And we think that was just simple legal error. The Supreme Court has never said that plaintiffs, when they're offering illustrative maps, can predominantly consider race because that would be an equal protection violation. They haven't said you can't either if you have a compelling interest. Is that fair or not? I think they said differently in Milligan, just this last term, Your Honor. In Milligan, both the plurality and all the dissents agreed that plaintiffs would not be able to satisfy Jingles 1 in that case if their illustrative maps were predominantly based on race. Now, the plurality and the dissents in Milligan disagreed over whether there had been a sufficient show of — What results do you think you have for that in that proposition in Milligan? I think eight Justices. Justice Kavanaugh didn't join the plurality. I don't mean to chase you down that rabbit hole, but okay. But I think it is fairly well established that plaintiffs cannot satisfy Jingle 1s if their maps are predominantly based on race. Milligan treated with that question entirely. It was one of the main focuses between the — one of the main areas of disagreement between the dissents and the majority, or at least the plurality. But here, rather than making a finding of racial non-predominance, the district court simply assumed that it was an immaterial question, and we think that was legal error. And I have only a few minutes left. I'd like to save that for rebuttal. You may. Thank you. All right. Mr. — let's see. We'd like to hear from Mr. Gabert first. Yes, sir. And then I understand that we'll hear from the amicus next. So you'll have to stop when — well, let's see. She has the clock set for 15, which is your time. And then there will be five more. You may proceed. Thank you, Your Honor, and may it please the Court, for the first time in over 30 years, there are zero Native Americans serving in the North Dakota State Senate today because of the way the 2020 redistricting lines were configured. The district court correctly ruled that this violates Section 2 of the Voting Rights Act, but the Secretary asks this Court to excuse that violation based on a radical proposition that when Congress enacted the Voting Rights Act, it meant to silently foreclose voters from pursuing their preexisting cause of action, expressed cause of action, under Section 1983. This turns Section 1983 jurisprudence on its head. As we explain in our brief, the novel argument is an ill fit for the Gonzaga test, but because we so clearly meet the two prongs of the Gonzaga test, I'd like to start there. Now, the Supreme Court answered the question left open by the Arkansas NAACP majority, as Justice Grunder noted, in its Tlaibsky decision. What the Arkansas majority said is, it is unmistakable that Section 2 focuses on the benefited class with the right of any citizen to vote language, but we are unsure what to do when the same statutory sentence also talks about those who are prohibited from violating the right, and the Supreme Court expressly answered that question in Tlaibsky. You probably heard some of the questions earlier about defining the right. In this vote dilution situation, how would you articulate the right? I would articulate it as the Supreme Court has. In the Shaw case, as we mentioned, Chauvy-Hunt, and then again, citing, quoting that same language in Lulac v. Perry, and this is at 548 U.S. at 437, quoting Shaw v. Hunt, the Supreme Court said, quote, a local appraisal is necessary because the right to an undiluted vote does not belong to the minority as a group, but rather to its individual members. And so the right is to an undiluted vote, and the Supreme Court has answered the question that it is an individual right from the statute. And counsel, I think, conflates the evidence of proving a violation of that right with the right itself. So the individual has a right to have their vote not be diluted on account of race and be worth less than, say, their white neighbor across the street. That's what the individual right is. We look to how the district lines are configured and how that configuration interacts with the existing political and racial conditions in the area to determine whether or not the vote is being diluted. But the right is to have your individual vote not be diluted. Isn't it more, though, and I understand what you're quoting from the Supreme Court, but just stepping back from that, isn't it more the right of a minority to have representation like them? And doesn't that sound like a group right? No, no, Your Honor. It's an individual right not to have the value of your individual vote not be diluted on the basis of your individual race. And that's how the Supreme Court is. But let's explore that. I mean, diluted, you're still, your vote counts one vote, right? What do we mean by diluted in that situation? It means that the value of your vote is less because of your race. And your ability to have that vote matter toward the outcome of the election is diluted as compared to your neighbors or folks of a different race. And that's why the Supreme Court has identified that as an individual. It doesn't count as a half vote. It's still a full vote. The vote counts. It does not lead to representation on an equal basis with other voters. And that, it would be the same thing if we said that the evidence of an employment discrimination case because it looks to how other employees are treated to determine whether or not the claimant is being discriminated against. That's still an individual right to be free of discrimination. And this is, every case of discrimination is about how are you treated in relation to how are other people treated. And so it's no different than that. And so we'd have to say that no discrimination case is an individual right to adopt the idea that just because the evidence for showing a violation involves looking at how others are treated, that that does not somehow convert the right into being grouped. And I don't think we need to spend too much time on it because the Supreme Court has twice answered the question. And in the LULAC case, this was a Section 2 case brought by private plaintiffs. And the Supreme Court defined it as an individual right, not a group right. What about his argument that the remedy doesn't focus on the individual and therefore is an indication of something other than an individual right? Whether or not the individual is placed in a new district does not matter to whether or not their vote is no longer being diluted. So once the court remedies the dilution that's happening in the area, the fact that the individual may not live in a district they would prefer to live in, their vote is no longer being diluted on account of race. And so their injury has been remedied regardless of what district they're placed in. Now, with respect to the second prong of the Gingell's, I'm sorry, of the Gonzaga test, the Secretary has the burden that it's presumed, once an individual right is found, it is presumed that Section 1983 applies. And just to step back, there's been some statements that this was we're trying to create a backdoor or circumvent this Court's decision in Arkansas. Congress created the front door in 1874 when it created an express right of action to enforce rights and privileges and immunities secured by the Constitution and laws of the United States. And we walked through that front door as plaintiffs in this lawsuit. And what the Secretary's burden is, is to show that it is incompatible with the existing enforcement scheme, the public enforcement scheme in the statute, to follow the express cause of action that Congress already created. And they don't even argue that it's incompatible. You will not see an argument in their brief that there's incompatibility. They simply say there's a comprehensive scheme and so that's enough. The Tlaibski majority held the opposite of that. It said that when there is a comprehensive scheme, it is the incompatibility, the thwarting of the scheme that Congress created in the subsequent statute that we are to look for. And the Supreme Court has said, and this is in Tlaibski at 188, quote, The existence of a more restrictive private remedy has been the dividing line between those cases in which we have held that an action would lie under Section 1983 and those in which we have held that it would not. And here, there is no express private remedy whatsoever. The Court has held there isn't an implied remedy, but that says nothing about whether the express cause of action that Congress had already created applies. In fact, this Court in Arkansas NAACP said that the remedy in the statute was a narrow one. And so there's not a single case you will find where a court says that a narrow public remedy somehow silently forecloses the use of the express remedy that Congress already created. And I think it's important to ground ourselves in the fact that we talked a little bit about what was the Congress thinking in 1982 when it amended the Act. In 1965, and again in 1982, what it was thinking was, we already solved this problem. We created a cause of action expressly for this. So that's why you see in 1964, Congress in the Civil Rights Act, where it banned discrimination by private hotels, inns, and restaurants, it had to create an express cause of action because 1983 did not allow people to sue hotels. So it created an express cause of action against private actors. Then in 1965, it had no need to do that with Section 2 because it had already done it. And just as this Court in Arkansas said it would not look to the implied subtleties to try to divine an intent of Congress to create something new, it cannot look to divine subtleties to say that Congress foreclosed use of the express remedy it had already created in Section 1983. And again, in this context, statutory stare decisis would be at its apex because the Congress has repeatedly reauthorized the Voting Rights Act, Section 2, and not once has it given any indication that it did not intend its express cause of action under Section 1983 to apply in this circumstance. And as the Supreme Court said in Milligan, that type of statutory decisis is important in this context. And where the Supreme Court has found that implied foreclosure, those express private rights, created additional hurdles that plaintiffs had to go through. They maybe had to wait a period of time. They had to exhaust some administrative remedies. And so by allowing the 1983 remedy to go forward, they would be circumventing procedures they were required to follow under the statute. This statute actually says you don't have to exhaust any remedies before you file a  And so the Secretary has not satisfied its burden to show any incompatibility. In fact, they haven't even argued that. So I think the Court could actually just stop at the fact that they've not met their burden in this case to show incompatibility. I want to talk a bit as well about the Secretary's arguments on the merits. I don't think the Court should actually reach either of these arguments. Starting with the first jingles precondition, the Secretary repeatedly argued in the The District Court found in its findings of fact at Appendix 468, and this is page 14 of the decision, that the Secretary's expert agreed that Jingles Prong 1 was satisfied. And the reason was the existing map, District 9 in the existing map, was over a majority Native Americans, 54.5 percent Native voting age population. And so the Secretary argued, and it's not just the expert, in the opening statement at Appendix page 79, the Secretary's counsel argued that the first jingles precondition was satisfied. In the Secretary's proposed legal conclusions filed after the trial, this is docket 132 at page 27, the Secretary argued as a proposed finding for the Court, quote, Given Legislative District 9 as a majority Native American in terms of voting age, per the first jingles precondition, it is possible to create a district where the minority group in question comprises a majority of the district's population. There's no argument that that district was not reasonably configured. And so Jingles 1 is not at issue in this case. And the District Court did not clearly err, given the Secretary's arguments and testimony of this expert, that it was. In fact, what the Secretary is now trying to do is bring in arguments about the remedial map that the District Court put in place, despite the fact that the Secretary has not filed an appeal about that remedy map and has not, did not dispute its entry in the District Court. It did not even file an opposition to the remedial map being put into place. And so I think it's actually a jurisdictional problem to collaterally attack the District Court's remedy, having failed to appeal it in the District Court, and trying to bring that into the first jingles precondition when they've already conceded that the first jingles precondition is satisfied. In any event, as I mentioned in the prior appeal, the legislature itself has submitted to the District Court the plaintiff's maps and said, we think these satisfy the compactness requirements that we followed. And the argument from the Secretary that it was some burden that plaintiffs had, notwithstanding their concession on Jingles 1, to discuss, to put on testimony or discuss the racial predominance, that is, first, that's an argument they raised for the first time in their reply brief in this Court. Never before did they argue that there was a burden on plaintiffs to disprove racial predominance. But in any event, the only authority they cite is the dissent of Justice Alito in the Milligan case. The majority rejected that and characterized those arguments as being attempting to rewrite Section 2 jurisprudence anew. And so what this Court did in Bone Shirt is it looked at whether the District complied with the traditional districting principles, which here the Secretary's expert conceded it did. It follows county borders. It has as many county splits as the enacted plan. It follows natural boundaries, rivers. They complain about the shape of Benson County. Benson County, you know, follows Devils Lake and it follows the — goes down and follows the Cheyenne River. And so that is not a violation of a traditional districting principle. And so the District Court did not err by taking their concession on Jingles 1, citing the traditional districting principles, and doing as the Supreme Court said in Bethune Hill, which is that it has never found racial predominance or remanded a case for a finding on the question in the absence of a violation of traditional districting principles. And briefly, with respect to the second Jingles prong, this Court should not reach that question as well because the Secretary's expert agreed that the second — that the subdistricts satisfied the second Jingles precondition, and they do not dispute that the District as a whole satisfies the second Jingles precondition. And so it's not even possible to have reversal on that question. And the District Court could not have clearly erred by relying on the expert testimony of both experts of — with respect to Jingles 1 and 2. CHIEF JUSTICE ROBERTS, JR.: Very well. Thank you for your argument.  Mr. Bakker, we'll hear from you.  BAKKER, JR.: Good morning, Your Honors. May it please the Court, Jonathan Bakker for the United States' amicus. Going back to the 1983 question, I want to make a couple of additional points about both Gonzaga Step 1 and Gonzaga Step 2. I fully agree with — I think that Mr. Gaber nicely explained what the right-at issue is in a vote dilution case. It's the right to an undiluted vote. But I also want to push back against sort of the hyper-focus on vote dilution claims from the State's briefing. Reading the State's brief, one might get the impression that there's two categories of Section 2 claims, 2A claims and 2B claims. That's not the case. Just looking at the structure of Section 2, Section 2A provides a right to individuals against the denial or abridgment of a citizen's right to vote. And Section 2B provides a — one way of proving that there has been a denial or abridgment of a citizen's right to vote. So there's not 2A and 2B. And even within the universe of results claims, vote dilution is just one theory of proving that a practice or procedure results in the denial or abridgment of a right to vote. But even if we're focusing squarely — and I say that because there's no way to just sort of extricate vote dilution from the text of Section 2 and say, well, vote dilution claims aren't privately enforceable, but everything else is. It's a whole package. But even looking at squarely vote dilution claims, as Mr. Gaber explained, it's the right to — an individual's right to an undiluted claim. And to pick up on your question, Judge Grunder, you know, I think DeGrande from the Supreme Court is on point here. It's not a right to have representatives that look like you because Section 2 doesn't give a right to any particular outcome. It's the right for an opportunity to elect the preferred representatives. And so that's what vote dilution claims are about. In jurisdictions where there's racially polarized politics and race pervades the politics in that jurisdiction, districts need to be configured in a way to ensure that minority voters have an equal opportunity to elect their preferred candidates. But it's about opportunity. On the Gonzaga Step 2, you know, we — the State in its argument today hasn't addressed Gonzaga Step 2 at all. And I think that's telling. As Mr. Gaber said, the entire argument is focused on the comprehensiveness on the scheme and not on incompatibility, which Talevsky said is the sine qua non of the, you know, foreclosure question. And I think the way to think about Gonzaga Step 2 is it's really the inverse of Sandoval Step 1. As difficult as it is in the face of congressional silence for a plaintiff to establish that a statute nevertheless contains an implied private right of action, it's just as difficult in Gonzaga Step 2 in the face of congressional silence for a defendant to establish that Congress nevertheless intended to foreclose private enforcement of the statute under 1983. So this is a really difficult hurdle that the State hasn't even really attempted to summit. And it's so difficult because also, as Mr. Gaber pointed out, the dividing line is private — a narrower private right of action. So you're looking at cases — or at least the Supreme Court cases on point have been about narrow private rights of action compared to 1983. There's no Supreme Court case about asserted conflict between a public right of action and a private right of action. And indeed, I'm aware of no case at any level that has ever found private enforcement of a statute foreclosed under 1983 based on an asserted conflict between a public enforcement scheme and a private enforcement scheme. And here, if the question is incompatibility, we know for a fact that there's no incompatibility between public enforcement of Section 2 and private enforcement under 1983 because it's not hypothetical. We have 60 years of the overwhelming number of cases under Section 2 being brought by private plaintiffs, 400 compared to 44 brought by the Department of Justice. So we know that these — that public and private enforcement can comfortably coexist and have comfortably coexisted under this statutory framework. If Your Honors have no further questions, I'll yield the balance of my time and ask this Court to affirm the district court's holding that Section 2 is privately enforceable under 1983. Thank you. Very well. Thank you for your argument. Mr. Axe, we'll hear rebuttal. May it please the Court. A couple points in response to what you just heard. So the first argument was that the Secretary's argument on the private right of action conflates the nature of the right with how you prove it. But if it was an individual right, as we discussed earlier, you would expect an individual focused remedy. Other cases, discrimination cases, you mentioned, for example, employment. In all of those cases, you are entitled to a remedy that benefits you personally. Counsel for the United States said the benefit was an opportunity to elect candidates of your choice. But for vote dilution claims, as we discussed earlier, even if you prevail, you are not entitled to be put into any district where the majority of your ethnicity has an opportunity to elect the candidate of their choice. You can still be left in a district where, due to racial block voting, the majority of your ethnicity does not have an opportunity to elect the candidate of their choice. So when you examine the remedies that are possible for a vote dilution claim, it's different from what you would expect for an individual right-focused claim. And I think it's somewhat unique for other sort of discrimination claims. Secondly, the argument was made that in 1982, Congress intended through silence for there to be enforcement using 1983. We would note that until the district court's decision in this case, we're not aware of any court ever saying that 1983 was the mechanism to enforce vote dilution claims. I mean, are you aware of a court that wrestled with it and came to the opposite conclusion? I mean, there was no need to address the issue, right? I mean, it is a matter of first impression, in part because of what this court did in the Arkansas NAACP case, correct? Yes, Your Honor. And I would say the Arkansas decision is actually what plaintiffs are pushing back against in there because prior to this court, prior to the district court's decision, courts had not looked at 1983 as the mechanism. So I think it's a little bit ahistorical to think Congress intended enforcement through 1983 when for the decades preceding then where enforcement had occurred, it had been assumed to occur as an implied right. Would you address incompatibility on the second prong of Gonzaga? The argument's been suggested from the other side that you simply drop that issue and you can't show that. What's your response? We didn't drop it, Your Honor. We argued it in our briefing. I didn't have time to address it when I stood up. I'll concede on the second prong that the State's showing is a higher burden. I'll concede that, just like the plaintiff showing is harder on the first prong. But we think when you look at Section 2, and it's entirely, as the Arkansas decision noted, the fact that the VRA only expressly creates a private right of action for the attorney general suggests, it at least suggests, and the Court has said in other contexts, where Congress creates an express private right of action, that should suggest at least, offers at least a suggestion. How about from a practical perspective, incompatibility has been proven disproven? Well, we would also say, and I'm almost out of time, but I guess we would also push back on incompatibility. Teleski said the question is intent. Intent is often proven by incompatibility, but the underlying question is still congressional intent, whether they intended to preclude it or not. And with that, I'm out of time. Very well. Thank you for your argument.